1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JIMMY PANGLE, | )  1:08cv01760 DLB |
| | ) |
| | ) |
| | )  ORDER REGARDING PLAINTIFF'S |
| Plaintiff, | )  SOCIAL SECURITY COMPLAINT |
| | ) |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## BACKGROUND

Plaintiff Jimmy Pangle ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.

## FACTS AND PRIOR PROCEEDINGS[1]

Plaintiff filed his application on July 5, 2005, alleging disability since July 25, 2003, due to back and knee problems.  AR 47-49, 75-82.  After Plaintiff's application was denied initially and on reconsideration, he requested a hearing before an Administrative Law Judge ("ALJ").  AR 14,

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1

40, 43-44.  On April 3, 2008, ALJ Robert A. Evans held a hearing.  AR 259-281.  He denied benefits on April 25, 2008.  AR 11-22.  The Appeals Council denied review on September 11, 2008.  AR 4-7.

Hearing Testimony

ALJ Evans held a hearing on April 3, 2008, in Palmdale, California.  Plaintiff appeared with his non-attorney representative, Issac Finch.  Vocational expert ("VE") Gail Maron also appeared and testified.  AR 259.

Plaintiff testified that he was 49 years old at the time of the hearing and completed high school.  He last worked part-time from September 2004 through January 7, 2005, when he was released because his restrictions could not be accommodated.  AR 262.  He was working for the government as an office assistant.  AR 264.

Plaintiff explained that he could no longer work because he was in "a lot of pain and agony" trying to sit and stand up.  When he stands, his legs get weak and he has to sit back down.  AR 270.  He also needs to lay down "once in a while."  AR 271.  He rated his pain as an eight to nine, with medication.  Plaintiff thought he could sit for an hour and a half to two hours but could only stand for a few minutes.  AR 271.  He lays down most of the day, and estimated he needed two or three one-hour breaks during the day.  He uses a heating pad two or three times a night and ices two or three times a night.  He also uses a heating pad and ices every hour to two hours during the day.  AR 272.

Plaintiff testified that his pain medications cause drowsiness, dizziness, confusion and shortness of breath.  He also uses a prescribed cane and back brace.  AR 273.  Plaintiff's wife and children do the housework and he only drives in an emergency because of his medications.  AR 274.

Plaintiff further testified that he gets "pretty irritable" at times and takes it out in his family, who get angry and stop helping him.  AR 274.  He feels helpless that he can't support his family and his friends stopped talking to him a long time ago.  Plaintiff is not receiving mental health treatment because he can't afford it.  AR 275.

For the first hypothetical, the ALJ asked the VE to assume a person of Plaintiff's age, education and work history.  This person could lift at the light level, stand or walk for four hours and sit for four hours total, 30 minutes at a time.  He would need a cane for standing or long walking and would need to frequently alternate between sitting and standing.  AR 276.  He could occasionally bend, stoop, crouch, crawl, climb and kneel.  The VE testified that this person could not perform Plaintiff's past work as a receptionist because he wouldn't have the option to sit or stand.  AR 277.  However, there were light jobs that would allow for alternating of sitting and standing, such as inspector of surgical instruments and assembler of electrical accessories.  AR 277.

For the second hypothetical, the ALJ asked the VE to assume that this person, with pain medication, could maintain attention, concentration, pace and persistence for at least two hours before needing to take a brief break.  He could then go back for another two hours, etc., throughout an eight hour day.  The VE testified that this would not change the positions available since most employers offer breaks every two hours.  AR 287.

If this person's pain is so severe that he could not maintain attention, concentration, pace and persistence for "anything closely approaching two hours, but would need other multiple breaks during the day," the VE testified that this person could not work.  AR 278-279.

Plaintiff's representative asked the VE to assume the same person in the first hypothetical, with a limitation to lifting up to five pounds on an occasional basis.  The VE testified that this person could not work.  AR 279.

Plaintiff's representative next asked the VE to assume a person who could perform the following functions on an occasional basis:  understanding, remembering and carrying out detailed instructions, maintaining attention and concentration, maintaining activities within a schedule, keeping regular attendance and being punctual, sustaining an ordinary routine without special supervision, working in coordination with others, completing a normal workday and work week, interacting appropriately with the general public, accepting instructions and criticism and getting along with co-workers.  The VE testified that this person could not work.  AR 279-280.

Medical Record

X-rays of Plaintiff's lumbosacral spine taken on July 14, 1997, showed no acute injury. AR 251. An MRI performed on August 22, 1997, was also normal. AR 253.

Lumbosacral spine x-rays taken on August 9, 1999, showed no changes. AR 252.

On April 4, 2002, Plaintiff underwent an MRI of his lumbosacral spine. The test showed minimal desiccation of the L4-L5 disc with minimal diffuse posterior annular bulging that was not clinically significant. AR 254.

On July 8, 2004, Plaintiff saw Young N. Paik, M.D., for an Initial Comprehensive Orthopedic Evaluation. He noted Plaintiff had been cleared to return to work on May 4, 2004, but was recently instructed to "stay out of work." AR 231, 240. On examination, there were no muscle spasms though there was minimal tenderness of the lumbosacral junction. Plaintiff could stand on his toes and heels. Dr. Paik diagnosed status-post lumbar strain of the lumbosacral spine and degenerative disc disease, caused by a work-related injury on July 14, 1997. He had recurrent muscle strain for the past six years. Dr. Paik believed that Plaintiff was permanent and stationary and could return to his previous work activities with job modification. AR 241-247.

Plaintiff underwent x-rays of his lower back on July 17, 2004. The x-rays were normal. AR 230.

On September 14, 2004, neurosurgeon Abdallah S. Farrukh, M.D., performed a facet block bilaterally at L3-L4, L4-L5 and L5-S1. AR 248.

Plaintiff returned to Dr. Farrukh in February 2005. He complained of persistent low back pain. Dr. Farrukh noted that Plaintiff was cane dependent. Straight leg raising was positive bilaterally. Muscle tone was within normal limits in the upper and lower extremities. Dr. Farrukh diagnosed chronic low back pain. AR 157-158.

On July 10, 2005, Plaintiff went to the emergency room because he ran out of morphine. On examination, he had significant spasm in his lumbar region and straight leg raising was positive bilaterally in the sitting position. Barbara Dodd, D.O., diagnosed chronic low back pain. Plaintiff was given a Heparin lock and morphine IV. He also received a prescription for morphine and told

to follow up with Dr. Farrukh.  He was also told to follow up with Dr. Shamie at the UCLA spine institute.  AR 193.

An MRI of Plaintiff's lumbar spine taken on August 9, 2005, revealed broad based bulge of the annulus fibrosis at L4-L5, slightly eccentric and to the right with associated facet arthropathy causing very mild right sided foraminal stenosis.  AR 147-148.

On September 14, 2005, Plaintiff returned to Dr. Farrukh and complained that he was having constant lower back pain that radiated down his hips.  The pain was worse after sitting for a long time.  Plaintiff was only able to sleep for 45 minutes at night.  On examination, there was no sensory loss and muscle tone in his upper and lower extremities was within normal limits.  He diagnosed chronic pain, facet joint disease and bilateral carpal tunnel syndrome.  AR 144-145.

Plaintiff underwent an MRI of his cervical spine on October 5, 2005.  The test revealed cervical spondylosis, most prominent at C5-6, where there was abnormal signal intensity within the disc space, presumably degenerative.  There were posterior disc/osteophyte complex and uncovertebral degenerative changes resulting in mild right and mild-to-moderate left sided foraminal stenosis.  AR 142-143.

On October 28, 2005, Plaintiff reported constant back pain, rated at an eight out of ten. The pain radiates down Plaintiff's legs and he is unable to sleep.  Plaintiff was taking morphine for pain.  AR 140-141.

On February 17, 2006, Plaintiff returned to Dr. Farrukh and complained that he was still having trouble sleeping due to pain in his legs.  Dr. Farrukh indicated that Plaintiff needed to go to a chronic pain management center.  AR 134-135.

Plaintiff went to the emergency room on March 11, 2006, after running out of morphine sulfate.  Plaintiff was in moderate distress and had tenderness to palpation in the bilateral paraspinal area as well as the low lumbar paraspinal areas.  Charles A. Shull, M.D., diagnosed exacerbation of chronic low back pain and narcotic withdrawal.  Plaintiff received demerol, phenergan and robaxin and was prescribed morphine sulfate.  AR 191.

Plaintiff went to the emergency room again on May 26, 2006, because he ran out of medication and had not contacted his doctor.  Plaintiff was "quite irritated," agitated, and may

have been having withdrawal.  Plaintiff sat bent over and was bent over when he tried to walk. He had tenderness in the lumbar area with a little radiculopathy.  He had very limited flexion and extension and tenderness in both sciatic notches.  Bruce M. Beckford, M.D., diagnosed acute exacerbation of low back pain.  He prescribed pain medication and instructed Plaintiff to follow up with his doctor for all future pain medications.  AR 190.

Plaintiff saw family practitioner David Lusk, M.D., on August 9, 2006.  He complained of back pain for the past three weeks after going on a cross-country trip to Kansas.  Dr. Lusk noted that Plaintiff had been "retired for one and a half years."  Plaintiff was having difficulty sleeping and had been depressed about all he has gone through.  Plaintiff appeared to be in pain and was walking bent over with a cane.  Dr. Lusk stated that Plaintiff needed to get into a chronic pain management program as quickly as possible.  AR 122-123.

On October 18, 2006, Plaintiff returned to Dr. Lusk.  He reported that he takes medication at 3 or 4 in the morning and again when he comes back from school.  His back brace helps a little, but he can't wear it too long.  Dr. Lusk noted that Plaintiff was "retired from the base."  Dr. Lusk continued to manage Plaintiff's chronic pain.  AR 118.

On December 5, 2006, Plaintiff told Dr. Lusk that his pain was worse during the first six hours of the day.  Plaintiff went on a trip and did better than his previous trip, though he did have some back pain.  Plaintiff was in no acute distress.  AR 114.

On January 10, 2007, Dr. Lusk noted that Plaintiff was walking with a cane, slightly bent over, but was in no acute distress.  He had an episode of pain during the visit.  AR 111.

Plaintiff saw Dr. Lusk on February 2, 2007, and a majority of the visit was spent "in counseling."  Plaintiff had pain in his shoulders and significant lower back pain, but his insurance would not pay for him to treat at a pain clinic.  Plaintiff wanted to go back to school and work and was depressed by his situation.  AR 109.

On March 10, 2007, Plaintiff saw Jagvinder Singh, M.D., for a consultive examination. Plaintiff reported a history of neck pain for three years and radiating back pain.  Plaintiff told Dr. Singh that he had no problem with dressing, grooming or bathing.  He drove and tried to take short walks, but could not do much else because of low back pain.  AR 180.

On examination, Plaintiff walked with a cane and had difficulty getting on and off the examination table and taking off his shoes. He also wore a back brace and bilateral wrist braces. Plaintiff had low back spasms and tenderness over the SI joint. Range of motion in his cervical spine was within normal limits. Plaintiff refused testing in his dorsolumbar spine. Plaintiff could not stand on his heels and toes and could not perform tandem walk. Motor strength was 5/5 in all muscle groups with no evidence of atrophy. Plaintiff had decreased vibratory sense on both legs below the knee. Reflexes were 2/4 bilaterally. AR 182-183.

Dr. Singh diagnosed back pain, history of neck pain and history of bilateral wrist pain. There were no physical findings or limitations related to Plaintiff's neck and wrists. Given Plaintiff's low back spasms and tenderness, Dr. Singh thought Plaintiff could stand and walk for about four hours, with breaks. He could sit for about four hours, with frequent changes of positions. Plaintiff needed a cane for prolonged standing or walking. Plaintiff could lift and carry 25 pounds occasionally and 10 pounds frequently. Plaintiff would have problems in bending, stooping, crouching, climbing, kneeling and crawling. AR 184.

Also on March 10, 2007, Plaintiff saw Rosa Colonna, Ph.D., for a consultive psychiatric examination. Plaintiff was dressed with an "excessive amount of orthopedic hardware," including wristbands, a back brace, a TENS unit and a cane. Plaintiff was angry throughout the evaluation. Plaintiff reported that he reads and watches television and plays with his dog. He occasionally needs help with dressing and bathing. AR 185-187.

On mental status examination, Plaintiff was a hostile, angry individual with an excessive amount of orthopedic gear. He alternated between sitting and standing because of pain and took Oxycontin during the interview. Plaintiff was "ranting and raving and cussing the Federal Government." His psychomotor activity suggested exaggeration of physical symptoms. His mood was dysthymic and his affect was irritable. Plaintiff's concentration, memory, insight and judgment were intact. AR 188. His overall cognitive ability was within the normal range. AR 189.

Dr. Colonna diagnosed mood disorder associated with generalized medical condition, and personality disorder, dependent traits. She opined that Plaintiff could understand, remember and

carry out short and simplistic instructions without difficulty.  He had a mild inability to understand, remember and carry out detailed instructions.  He could make simplistic, work-related decisions without special supervision.  Because of Plaintiff's anger over his termination, he had a mild inability to interact appropriately with supervisors, coworkers and peers on a consistent basis.  Dr. Colonna believed that Plaintiff would benefit greatly from supportive outpatient mental health treatment and a psychotropic medication evaluation.  AR 189.

Plaintiff returned to Dr. Lusk on March 22, 2007.  Dr. Lusk noted that Plaintiff was in more pain for a few weeks after the disability evaluation.  Plaintiff was in no acute distress and was walking with a cane.  He determined that Plaintiff needed chronic pain management and noted that he was chronically using oxycodone.   AR 105.

Also on March 22, 2007, State Agency physician C.H. Dudley, M.D., completed a Mental Residual Functional Capacity Assessment.  Dr. Dudley opined that Plaintiff had moderate limitations in the following category:  understanding, remembering and carrying out detailed instructions, maintaining attention and concentration, performing activities within a schedule, maintaining regular attendance and being punctual, sustaining an ordinary routine without special supervision, working in coordination with others, completing a normal workday and work week, interacting appropriately with the general public, accepting instructions and criticism, getting along with co-workers, responding appropriately to changes in the work setting and setting realistic goals or making plans independently of others.  Dr. Dudley opined that Plaintiff could perform simple tasks with limited contact.  AR 159-160.

On March 26, 2007, a State Agency physician opined that Plaintiff could occasionally lift 25 pounds, 10 pounds frequently, stand and/or walk for four hours and sit for four hours.  Plaintiff needed a cane for prolonged standing and walking.  Plaintiff could occasionally climb ramps and stairs but could never climb ladders, ropes or scaffolds.  Plaintiff could occasionally balance, stoop, kneel, crouch and crawl.  AR 162-167.

Plaintiff saw Dr. Farrukh on March 29, 2007.  Plaintiff had a slow, antalgic gait and displayed pain behavior.  AR 132-133.

On April 11, 2007, Plaintiff underwent nerve conduction studies that showed a moderate degree of ulnar neuropathy across the left elbow.  There was no evidence of carpal tunnel or peripheral neuropathy.  AR 214-215.

On May 1, 2007, Dr. Farrukh completed a Medical Source Statement.  He indicated that Plaintiff could occasionally and frequently lift less than 10 pounds because of his back pain.  He could stand and/or walk for less than two hours in an eight hour day and would need frequent breaks.  Plaintiff could sit for less than two hours in an eight hour day and would need frequent breaks and the ability to alternate between sitting and standing.  He could never climb, balance, stoop, kneel, crouch or crawl.  Plaintiff had to avoid chemicals and dust.  Dr. Farrukh believed that Plaintiff's prognosis was poor.  AR 126-127.

On June 11, 2007, Plaintiff saw Dr. Lusk and reported that his back worsened after he was "wrestling with the glass door."  Dr. Lusk noted that it takes two to three weeks for his back to get better.  Plaintiff had no numbness or tingling in his legs and was in no acute distress, though he appeared to be in more discomfort than usual.  He was walking with a cane and had a back brace on.  Dr. Lusk indicated that Plaintiff's insurance did not approve treatment at a pain clinic. AR 96.

Plaintiff saw Dr. Farrukh on October 16, 2007.  His gait was slow and he had a sensory deficit in his left ulnar nerve.  He diagnosed ulnar neuropathy, chronic low back pain, and degenerative disc disease at C5/C6.  AR 208-209.

Plaintiff underwent an MRI of his thoracic spine on October 29, 2007.  The test revealed multilevel Schmorl's node formation throughout the mid and lower thoracic spine, a benign hemangioma in the T3 vertebral body and minimal anterior wedging of the T7 vertebral body, which appeared chronic without significant vertebral body height loss or retropulsion.  There was no central canal stenosis or foraminal narrowing.  AR 195-196.

On November 20, 2007, Dr. Farrukh completed a Spinal Impairment Questionnaire.  He first examined Plaintiff in August 2004 and last saw him on October 16, 2007.  He diagnosed Plaintiff with chronic pain, ulnar nerve neuropathy and lumber spondylosis and listed his prognosis as poor.  In support, he cited limited and painful range of motion, paraspinal muscle tenderness,

mild muscle spasms, decreased sensation in the cervical spine, increased reflexes in both knees, abnormal gait and crepitus in both knees.  He had no muscle atrophy in his cervical or lumbar spine.  He noted that Plaintiff was very depressed and suffered from chronic, constant pain from a bulge in his lumbar spine and deterioration in his cervical spine.  His pain resulted from a spinal injury in 1997.  AR 88-94.

Dr. Farrukh indicated that Plaintiff's pain had not been completely relieved with pain medication.  Plaintiff has undergone physical therapy and spinal injections, but his condition worsens with activity.  In an eight hour day, he believed that Plaintiff could sit for "0-1" hours and stand for "0-1" hours.  He would need to get up every 10 minutes and move around for 10 minutes.  Plaintiff could never lift or carry any weight.   His pain would constantly interfere with attention and concentration.  He could handle low stress in the workplace.  Plaintiff would need to take unscheduled breaks every ten minutes to rest for 30 minutes.  Dr. Farrukh opined that Plaintiff could not push, pull, kneel, bend or stoop and would need to avoid fumes, gases, temperature extremes, dust and heights.  AR 88-94.

ALJ's Findings

The ALJ determined that Plaintiff's low back injury was a severe impairment.  Despite this, he found that Plaintiff retained the residual functional capacity ("RFC") to lift and carry 25 pounds occasionally, 10 pounds frequently, stand and/or walk for four hours and sit for four hours, with frequent changes of position.  Plaintiff needed to use a cane for prolonged standing or walking and could occasionally bend, stoop, crouch, climb, kneel and crawl.  AR 16-17.  Based in part on the testimony of the VE, the ALJ determined that while Plaintiff could not perform his past relevant work, he could perform a significant number of jobs in the national economy.  AR 20-21.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla,"

1  *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v.*

2  *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a

3  reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at

4  401. The record as a whole must be considered, weighing both the evidence that supports and the

5  evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler*, 760 F.2d 993, 995

6  (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the

7  proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This

8  Court must uphold the Commissioner's determination that the claimant is not disabled if the

9  Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

10 substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

11 Cir. 1987).

12                                          **REVIEW**

13         In order to qualify for benefits, a claimant must establish that he is unable to engage in

14 substantial gainful activity due to a medically determinable physical or mental impairment which

15 has lasted or can be expected to last for a continuous period of not less than 12 months. 42

16 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of

17 such severity that he is not only unable to do her previous work, but cannot, considering his age,

18 education, and work experience, engage in any other kind of substantial gainful work which exists

19 in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The

20 burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir.

21 1990).

22         In an effort to achieve uniformity of decisions, the Commissioner has promulgated

23 regulations which contain, inter alia, a five-step sequential disability evaluation process. 20

24 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994). Applying this process in this case, the ALJ

25 found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of

26 his disability; (2) has an impairment or a combination of impairments that is considered "severe"

27 (low back injury) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does

28 not have an impairment or combination of impairments which meets or equals one of the

impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform his past relevant work, but (5) retains the RFC to perform a significant number of jobs.  AR 16-21.

Plaintiff argues that the ALJ (1) erred in rejecting the opinion of Dr. Farrukh; and (2) erred in finding that he could perform the alternative work identified by the VE.

## DISCUSSION

A.   Dr. Farrukh's Opinion

Plaintiff argues that the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Farrukh's limitations set forth in his 2007 reports, both of which found Plaintiff unable to perform even sedentary work.

The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.1995).  Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 830.  Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Id.* (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)).  This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir.1989).  The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct.  *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988).  Therefore, a treating physician's opinion must be given controlling weight if it is well-supported and not inconsistent with the other substantial evidence in the record.  *Lingenfelter v. Astrue*, 504 F.3d 1028 (9th Cir. 2007).

In *Orn v. Astrue*, 495 F.3d 625 (9th Cir. 2007), the Ninth Circuit reiterated and expounded upon its position regarding the ALJ's acceptance of the opinion an examining physician over that of a treating physician. "When an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions

of the examining physician are not "'substantial evidence.'" *Orn*, 495 F.3d at 632; *Murray*, 722 F.2d at 501-502. "By contrast, when an examining physician provides 'independent clinical findings that differ from the findings of the treating physicians, such findings are 'substantial evidence.'" *Orn*, 496 F.3d at 632; *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir.1985). Independent clinical findings can be either (1) diagnoses that differ from those offered by another physician and that are supported by substantial evidence, *see Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir.1985), or (2) findings based on objective medical tests that the treating physician has not herself considered, *see Andrews*, 53 F.3d at 1041.

If a treating physician's opinion is not giving controlling weight because it is not well supported or because it is inconsistent with other substantial evidence in the record, the ALJ is instructed by Section 404.1527(d)(2) to consider the factors listed in Section 404.1527(d)(2)-(6) in determining what weight to accord the opinion of the treating physician. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. 20 C.F.R. 404.1527(d)(2)(i)-(ii). Other factors include the supportablility of the opinion, consistency with the record as a whole, the specialization of the physician, and the extent to which the physician is familiar with disability programs and evidentiary requirements. 20 C.F.R. § 404.1527(d)(3)-(6). Even when contradicted by an opinion of an examining physician that constitutes substantial evidence, the treating physician's opinion is "still entitled to deference." SSR 96-2p; *Orn*, 495 F.3d at 632-633. "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p; *Orn*, 495 F.3d at 633.

As an initial matter, the Court recognizes the importance placed on treating physician's opinions, as set forth in *Orn v. Astrue*. However, where the treating physician's opinion is not supported in the first instance, as here, *Orn* is not instructive.

The ALJ rejected Dr. Farrukh's "extreme limitations" mainly because he found them to be unsupported by the medical evidence. Indeed, a treating physician's opinion is validly rejected when it is unsupported by clinical findings. *Magallenes v. Bowen*, 881 F.2d 747, 751 (9th Cir.

1989). The ALJ contrasted Dr. Farrukh's limitations, which essentially rendered him incapable of even less-than sedentary work, with the objective evidence. For example, the ALJ noted that Plaintiff's most recent MRIs showed mild abnormalities. AR 18. Plaintiff's August 2005 MRI showed "very mild right sided foraminal stenosis." AR 147-148. His October 2005 MRI revealed mild right and mild-to-moderate left sided foraminal stenosis. AR 142-143.

The ALJ next explained that Dr. Farrukh's own treatment notes did not support the extreme limitations. Dr. Farrukh's notes from September 2004 through December 2007 noted antalgic gait and some abnormal reflexes, but the notes did not show sensory deficit or motor weakness. AR 18. While Dr. Farrukh found one instance of mild motor weakness in the upper extremities in March 2007, a follow-up nerve conduction study was consistent with moderate left elbow neuropathy but showed no evidence of carpal tunnel syndrome. AR 18. *Thomas v. Barnhart*, 278 F.3d 948, 957 (9th Cir. 2002) (treating physician's opinion may be rejected if unsupported by examination record). The ALJ also noted that he requested an explanation and justification from Dr. Farrukh, but he did not respond to the request. AR 19.

The ALJ also contrasted Dr. Farrukh's limitations with the records from Dr. Lusk, another treating source. AR 18. Specifically, the ALJ explained that notes from August 2006 through June 2007 showed complaints of low back pain and noted that Plaintiff walked bent over with a cane. AR 18. His notes showed no other significant abnormalities. In fact, Plaintiff told Dr. Lusk that he went on a cross-country trip to Kansas on August 9, 2006, and also reported that he went on a trip in December 2006. Plaintiff denied numbness or tingling in his legs on June 11, 2007, and reported that Dr. Farrukh did not recommend surgery. AR 18. *Magallenes,* at 751.

In assessing Plaintiff's RFC, the ALJ adopted the findings of Dr. Singh, the consultive examiner. The ALJ recognized that there were indeed some objective findings, including evidence of positive straight leg raising, sensory deficit in the lower extremities, abnormal reflexes and the need for a cane. He found that Dr. Singh's limitations best reflected the objective medical evidence. Contrary to Plaintiff's suggestion, the opinion of a consultive examiner can serve as substantial evidence where it is based on independent clinical findings that differ from the findings

of the treating physicians. *Orn, 495 F.3d at 632-633*; *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (consultive examiner's opinion is substantial evidence).

Plaintiff suggests that the ALJ improperly relied on Dr. Singh's opinion because Dr. Singh did not review prior records, including the MRI studies and Dr. Farrukh's treatment notes. However, a finding that a consultive examiner's opinion constitutes substantial evidence is not tied to the examiner's review of medical records. Rather, as explained above, the opinion of a consultive examiner can serve as substantial evidence where it is based on independent clinical findings that differ from the findings of the treating physicians. Moreover, Plaintiff's mild MRI findings are more in line with Dr. Singh's limitations than those of Dr. Farrukh.

Plaintiff also suggests that the ALJ could not adopt Dr. Singh's opinion over that of Dr. Farrukh, a specialist a neurosurgery. This fact alone does not preclude the ALJ from adopting Dr. Singh's opinion. While a physician's speciality is one factor relevant in the ALJ's assessment, it is not the sole factor and it certainly does not trump the weight of the objective medical evidence. 20 C.F.R. § 404.1527(d)(3).

Insofar as Plaintiff contends that the ALJ improperly substituted his lay opinion for that of Dr. Farrukh, he is incorrect. Plaintiff takes issue with the ALJ's findings that the lumbar MRI "only" showed mild abnormalities with no indication of nerve root impingement, as well as his interpretation of Dr. Farrukh's treatment notes. Plaintiff contends that just because the ALJ did not make the same conclusions from the medical evidence does not allow him to reject Dr. Farrukh's opinion. Yet that is precisely what the ALJ's role is in assessing a claimant's impairments and abilities. The ALJ is the final arbiter with respect to assessing and resolving ambiguities in the medical evidence, *Tommasetti v. Astrue*, 533 F.3d 1035, 1041-1042 (9th Cir. 2008), and the ALJ is solely responsible for the RFC finding. *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).

Plaintiff cites *Tackett v. Apfel*, 180 F.3d 1094 (9th Cir. 1999) in support of his argument, but there, the ALJ made an unsupported finding that a trip taken by the claimant negated the sitting restrictions imposed by the numerous physicians. As the court explained, there was no evidence as to how much cross-country driving the claimant did, if any, nor was there any

information on the frequency or duration of stops or whether the claimant rode sitting up or reclining. *Tackett,* at 1103. Here, the ALJ did not make any assumptions as to information not contained in the record. Instead, he properly reviewed and analyzed the medical evidence and found that while it did support certain limitations, it simply did not support the severe restrictions imposed by Dr. Farrukh.

Plaintiff also believes that the ALJ was "out of his depth" when he noted that "it is reasonable to assume that were the claimant as functionally limited as assessed by Dr. Farrukh, that the claimant would have been unable to attend the hearing as atrophy would have disabled him." AR 19. An ALJ is entitled to draw inferences logically flowing from the evidence. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982). It was reasonable for the ALJ to conclude that if Plaintiff was as limited as Dr. Farrukh suggested, he would have essentially been incapacitated and unable to attend the hearing. Indeed, Dr. Farrukh believed that since September 2004, Plaintiff could not sit for more than 10 minutes at a time, and not more than "0-1" hours total, could not stand/walk for more than "0-1" hours total, and could not lift any weight. AR 91. *See also Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ noted that claimant did not exhibit muscular atrophy or any other physical signs of an inactive, totally incapacitated individual).

The ALJ's treatment of the medical opinions was therefore supported by substantial evidence and free of legal error.

B.    Alternate Work

Plaintiff next argues that the ALJ's finding that he could perform the positions of electronics assembler or surgical instruments inspector was not supported by substantial evidence. Specifically, Plaintiff contends that the VE's testimony did not support a finding that the identified positions would accommodate a sit/stand option.

SSR 00-4p states that generally, occupational evidence provided by a VE should be consistent with the occupational information supplied by the Dictionary of Occupational Titles ("DOT"). Where there is an apparent conflict, the ALJ must elicit a reasonable explanation for the conflict before relying on the VE to support a determination or decision about whether the

claimant is disabled. *See* SSR 00-4p. The ALJ may rely on the testimony of a VE over that of the DOT by determining that the explanation given by the VE is reasonable and provides a basis for doing so.

Defendant contends that because the DOT doesn't address a sit/stand option, the VE's testimony cannot be "in conflict with something that does not exist." Opposition, at 11. Defendant is incorrect. In *Massachi v. Astrue*, 486 F.3d 1149, 1153-1154 (9th Cir. 2007), the Ninth Circuit found a conflict where the DOT did not indicate if a job could be performed with the given limitation. In this action, the DOT did not indicate if the assembler or inspector positions could be performed with a sit/stand option, therefore creating a conflict that warranted inquiry. *See eg., Valenzuela v. Astrue*, 2009 WL 1537876, *3 (N.D.Cal. 2009) (VE testimony that positions would accommodate sit/stand option was potentially in conflict with the DOT and warranted further inquiry by the ALJ).

The ALJ therefore committed legal error by failing to ask the VE whether his testimony was consistent with the information contained in the DOT. Although the ALJ finds in his decision that the testimony was consistent, his conclusion is not supported with an explanation from the VE and it is not correct. The ALJ was also required to "explain in the determination or decision how he or she resolved the conflict," which he did not do. SSR 00-4p. Where the ALJ fails to ask the VE if the positions are consistent with the DOT, the Court is unable to determine whether substantial evidence supports the ALJ's finding at step five. *Massanari*, 486 F.3d at 1153.

The failure to ask about a conflict can be harmless error in certain circumstances. The first is where there is no conflict, which is not the case here. *Massachi*, 486 F.3d at 1154, n. 19. The second instance is where "the vocational expert ... provided sufficient support for her conclusion so as to justify any potential conflicts." *Id.*

A review of the VE's testimony reveals that he did not provide sufficient explanation for the deviation. In fact, it is unclear whether the VE even believed there to be a conflict. When asked if Plaintiff could perform any light jobs with the sit/stand option, the VE replied, "There are jobs that are in the light category that allow for some alternation of sitting and standing and they typically center around jobs that are production, such as inspection, assembly, things like that."

1   AR 277.  Simply identifying positions, however, does not provide any explanation as to why the

2   VE believed that such positions would accommodate a sit/stand option.  *See eg.*, *Pearce v.*

3   *Astrue,* 2009 WL 3698514, *4 (W.D.Wash. 2009)* (where VE "merely testified" that there could

4   be a sit/stand option, the testimony was not sufficient to provide a reasonable explanation for the

5   deviation).

6           Based on the above, the ALJ's step five finding was not supported by substantial evidence

7   and was not free of legal error.

8   C.      Remand

9           Section 405(g) of Title 42 of the United States Code provides: "the court shall have the

10  power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying,

11  or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."

12  In social security cases, the decision to remand to the Commissioner for further proceedings or

13  simply to award benefits is within the discretion of the court.  *McAllister v. Sullivan*, 888 F.2d

14  599, 603 (9th Cir. 1989).  "If additional proceedings can remedy defects in the original

15  administrative proceedings, a social security case should be remanded.  Where, however, a

16  rehearing would simply delay receipt of benefits, reversal and an award of benefits is appropriate."

17  *Id.* (citation omitted); *see also* *Varney v. Sec'y Health & Human Serv.,* 859 F.2d 1396, 1399 (9th

18  Cir.1988) ("Generally, we direct the award of benefits in cases where no useful purpose would be

19  served by further administrative proceedings, or where the record has been thoroughly

20  developed.").

21          The Court finds that additional proceedings can correct the ALJ's error at step five and

22  the action should therefore be remanded.  On remand, the ALJ shall obtain the necessary

23  explanation from the VE to support the deviation from the DOT.

24                                         **CONCLUSION**

25          Based on the foregoing, the Court finds that the ALJ's decision is not supported by

26  substantial evidence and is therefore REVERSED and REMANDED to the ALJ for further

27

28

proceedings consistent with this opinion.  The Clerk of this Court is DIRECTED to enter

judgment in favor of Plaintiff Jimmy Pangle and against Defendant Michael J. Astrue,

Commissioner of Social Security.


     IT IS SO ORDERED.

**Dated:    February 22, 2010**              **/s/ Dennis L. Beck**
                                      UNITED STATES MAGISTRATE JUDGE